**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. _____**

| | |
|---|---|
| DAN E. KALE, JR., COURTNEY KALE, and 2K CONSULTING, LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>REPL BROKERAGE HOLDINGS, LLC d/b/a HTL FREIGHT, HTL FREIGHT HOLDINGS, INC., BRIAN BOLAND, WAI EE HO, ONU OKEBIE, and XYZ CORPORATION, )<br><br>Defendants. ) | **COMPLAINT**<br>(Jury Trial Demanded) |

NOW COME Plaintiffs Dan E. Kale, Jr., Courtney Kale, and 2K Consulting, LLC (collectively, "Plaintiffs"), by and through undersigned counsel, in the above-entitled action, hereby complaining of Defendants as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Plaintiff Dan E. Kale, Jr. ("Kale") is a citizen and resident of Chester County, South Carolina, over the age of eighteen years, and under no legal disability.

2.     Plaintiff Courtney Kale ("Courtney") is a citizen and resident of Chester County, South Carolina, over the age of eighteen years, and under no legal disability.

3.     Plaintiff 2K Consulting, LLC ("2KC") is a South Carolina limited liability company, and it has a registered office in Chester County, South Carolina.

4.     Defendant REPL Brokerage Holdings, LLC ("REPL") is a Georgia limited liability company, registered to do business in North Carolina, and has a registered office in Mecklenburg County, North Carolina. Upon information and belief, REPL does business as HTL Freight.

5.     Defendant HTL Freight ("HTLF") is a Delaware corporation, registered to do business in North Carolina, and has a registered office in Mecklenburg County, North Carolina.[1]

6.     Upon information and belief, Defendant Brian Boland ("Boland") is a citizen and resident of Mecklenburg County, North Carolina, over the age of eighteen years, and under no legal disability.

7.     Upon information and belief, Defendant Wai Ee Ho ("Ho") is a citizen and resident of Georgia, over the age of eighteen years, and under no legal disability.

8.     Upon information and belief, Defendant Onu Okebie ("Okebie") is a citizen and resident of Georgia, over the age of eighteen years, and under no legal disability.

9.     Upon information and belief, Defendant XYZ Corporation is a North Carolina corporation, which has a registered office in Mecklenburg County, North Carolina. Upon information and belief, Defendant XYZ Corporation is the Plan Administrator for REPL and/or HTLF's group health plan and is referenced herein as "Plan Administrator."

10.     This Court has jurisdiction over the subject matter of and the parties to this litigation.

11.     Venue is proper in this Court.

---

[1] It is unclear if REPL is actually registered to do business in North Carolina, or any other state for that matter, under the assumed name HTL Freight. As such, HTLF (a business with common ownership to REPL) is included in this action. Any reference to REPL hereinafter shall also be a reference to HTLF.

## FACTUAL BACKGROUND

12.     Prior to February 9, 2021, Kale was the sole shareholder of Sabre Express, Inc. a North Carolina Corporation ("Sabre") which was the majority owner of Heritage Trucking, LLC n/k/a HERT, LLC ("HERT").

13.     HERT was a commercial freight and logistics company.

14.     On February 9, 2021, REPL purchased the majority of the assets of HERT from Sabre and the other owner, including furniture, fixtures and equipment, company accounts, intellectual property, goodwill, and other assets ("Purchase").

15.     As it relates to the Purchase, the "Purchase Agreement" was the central governing document. A true and correct copy of the Purchase Agreement is incorporated herein by reference and attached hereto **Exhibit 1**.

16.     However, several other documents, relevant to this litigation, were executed in part and parcel to the Purchase, including but not limited to, a consulting agreement, a promissory note, a non-competition and non-solicitation agreement, and personal guaranties.

I.      The Purchase Agreement

17.     Pursuant to the Purchase Agreement, REPL purchased the assets of HERT for approximately $1,800,000.00.

18.     The Purchase was finalized on February 9, 2021 ("Closing Date").

19.     The Purchase Agreement also provided that the parties contemporaneously therewith would enter into and execute the following documents:

        a.      A consulting agreement between Kale (or a company owned and managed by him) and REPL ("Consulting Agreement"). The Purchase Agreement also outlined the compensation, commissions, and restrictive covenants to be included in the Consulting Agreement. A true and correct copy of the Consulting Agreement is incorporated herein by reference and attached hereto **Exhibit 2**.

b.     A non-compete and non-solicitation agreement restricting Kale from engaging in certain business activities, described in more detail below, for three years after the Closing Date. A true and correct copy of the Non-Compete Agreement is incorporated herein by reference and attached hereto **Exhibit 3**.

c.     A promissory note in the amount of $250,000.00 from REPL to Kale. A true and correct copy of the Promissory Note is incorporated herein by reference and attached hereto **Exhibit 4**.

d.     Unconditional personal guaranties for the $250,000.00 promissory note from Boland, Ho, and Okebie to Kale. True and correct copies of the Unconditional Guaranties are incorporated herein by reference and attached hereto **Exhibit 5**.

e.     A security agreement, in Kale's favor, in the REPL's accounts receivable securing the promissory note.

20.     As it relates to this litigation, the most important provision of the Purchase Agreement relates to health insurance.

21.     Paragraph 9(c) of the Purchase Agreement states:

<u>Employee Compensation</u>. With respect to any individual who is currently employed by any Seller (whether or not such individual becomes employed by Buyer at the Effective Time or thereafter, Buyer having no obligations to offer employment to any Sellers' employees), each Seller shall be responsible for payment of all wages, salaries and benefits payable to such individuals up to the Effective Time (and thereafter to the extent such individuals remain employed by Seller after the Effective Time). Each Seller shall timely pay and withhold all federal, state and other employment taxes as due with respect to all its employees through the Effective Time (and thereafter to the extent such individuals remain employed by any Seller after the Effective Time). **<u>Buyer agrees to maintain Courtney Kale as an employee of the Company until the first anniversary of the Closing Date and to provide health care benefits to Courtney, her spouse, and her three dependent children on the same terms and conditions as the Sellers provided such benefits prior to the Closing Date.</u>**[2]

(emphasis added).

---

[2] The Purchase Agreement explicitly states that "titles of sections and subsections herein have been inserted as a matter of convenience of reference only and shall not control or affect the meaning or construction of any of the terms or provisions herein." [Ex. 1, para. 15(d)]

22.     This clause of the Purchase Agreement was specifically negotiated into the Purchase Agreement.

23.     Kale negotiated this provision because of a desire to protect his family and ensure they had proper health insurance, especially his disabled daughter, Lucy – making Courtney and the Kale children third party beneficiaries to the Purchase Agreement.

24.     REPL hired Courtney Kale for one year.

25.     REPL also maintained health insurance, through a group health plan provided by BlueCross BlueShield of North Carolina ("BCBS"), for Courtney Kale and Kale and their children. A true and correct copy of the BCBS Insurance Card is incorporated herein by reference and attached hereto **Exhibit 6**.

26.     On or around May 13, 2024, one of Kale's sons attended a doctor appointment.

27.     While at the appointment, doctors questioned whether there was any insurance coverage.

28.     Kale contacted REPL via email to determine if REPL had cancelled the health insurance required by paragraph 9(c) of the Purchase Agreement.

29.     REPL denied it had cancelled the insurance. A true and correct copy of the Insurance Cancellation Denial is incorporated herein by reference and attached hereto Exhibit 7.

30.     Based upon this representation, Kale continued with emergency doctor appointments and other non-emergent appointments, many of which could have been rescheduled.

31.     However, REPL lied about the health insurance coverage.

32.     In fact, prior to Kale's request for reassurance and REPL's confirmation of continued coverage, REPL caused the required health insurance to terminate.

33.     BCBS sent a notice to Kale regarding his "proof of coverage." A true and correct copy of the Notice of Coverage is incorporated herein by reference and attached hereto **Exhibit 8**.

34.     The Notice of Coverage explained, "Dear Courtney, [t]his certificate proves the dates of your or your dependent's health coverage. Our records shows that you or your dependent's coverage ended or was canceled as of 03/31/2024 due to group terminated."

35.     Upon information and belief, BCBS terminated the required health insurance coverage due to REPL's nonpayment.

36.     According to REPL, it did not "cancel" the Kales' health insurance; REPL "just quit paying for it."

37.     Therefore, REPL either:

   a.     Purposefully terminated the Kale family's health insurance coverage as of March 31, 2024; or

   b.     Intentionally allowed the whole Kale family's health insurance coverage to lapse by failing to pay for it.

38.     Both of these options violate the Purchase Agreement.

39.     More egregiously, it deprived the Kales' children, including Lucy, of health insurance upon which they so desperately relied.

40.     In an effort to allow REPL to redeem itself, Kale, again on June 6, 2024, inquired of REPL regarding the status of health insurance coverage.

41.     REPL has not responded to this inquiry.

42.     REPL did not have the decency to notify Kale that the health insurance coverage had terminated.

43.     REPL never notified any member of the Kale family of their rights under the Consolidated Omnibus Budget Reconciliation Act, 29 U.S.C. 1161 *et seq.* ("COBRA") or the North Carolina equivalent.

44.     REPL never notified its Plan Administrator of any qualifying event, like the termination of Courtney Kale or the failure to pay the group health plan premium.

45.     Likewise, the Plan Administrator never informed the Kale family of any qualifying event nor provided notification of their rights to elect continuing coverage under COBRA or the North Carolina state equivalent.

46.     Based upon this misrepresentation, Kale has incurred uninsured medical costs and expenses that exceed $10,000.00.

II.     The Consulting Agreement

47.     As mentioned above, the Purchasing Agreement mandated the creation of the Consulting Agreement between REPL and Kale or a company managed and owned by Kale.

48.     As such, REPL entered into the Consulting Agreement, effective February 9, 2021, with 2KC, a company owned and managed by Kale.

49.     Per the Consulting Agreement, 2KC was to provide consulting services based upon 2KC's knowledge, experience, and expertise in the business of commercial freight and logistic services.

50.     REPL was to pay 2KC an annual fee of $105,600.00 for the consulting services.

51.     Additionally, for each calendar quarter, 2KC was eligible for a performance fee up to $6,000.00 (a $2,000.00 monthly maximum) if REPL's gross revenues met or exceeded 98% of REPL's revenue target of $400,000.00 (i.e., $392,000.00).

52.     Further, 2KC was entitled to 4.5% of gross revenue REPL collected on a monthly basis above the $400,000.00 revenue target.

53.     Based upon interactions with REPL, it is REPL's position that the Consulting Agreement terminated on August 31, 2023.

54.     REPL did not make annual payments to 2KC for 2022 or 2023 or 2024.

55.     REPL did not pay any performance fees to 2KC for 2022 or 2023 or 2024.

56.     REPL did not pay any commissions to 2KC for 2022 or 2023 or 2024.

57.     2KC continued to consult with REPL until January 2024.

58.     In total, REPL owes 2KC over $1,500,000.00 in unpaid fees and commissions.

III.    <u>The Promissory Note and Unconditional Personal Guaranties</u>

59.     As outlined in the Purchase Agreement, Kale loaned REPL $250,000.00 ("Loan").

60.     REPL executed and delivered a "Promissory Note" to Kale promising to repay the Loan.

61.     The loan is subject to a 5% per annum interest rate.

62.     Under the Promissory Note, REPL is required to make quarterly, interest-only payments, which began on April 1, 2021.

63.     All payments of principal, interest, penalties and other amounts are due by February 1, 2026, the Promissory Note's maturity date.

64.     However, REPL has unequivocally and positively expressed its refusal to make the principal payment under the Promissory Note.

65.     REPL's repudiation of its promise is a breach.

66.     Despite REPL's breach, Kale performed his obligation pursuant to the Loan more than three years ago.

67.     Kale has no other performance obligation under the Loan.

68.     Due to REPL's anticipatory breach, the full performance of the Promissory Note is due in total.

69.     Moreover, the Promissory Note is personally guaranteed by Boland, Ho, and Okebie.

70.     Per each Unconditional Guaranty, Boland, Ho, and Okebie all agreed to "irrevocably, absolutely, personally, jointly and severally, and unconditionally guarantee [to Kale] the payment in full, as and when payments are due[.]"

71.     Since REPL has repudiated and breached the Promissory Note, and the Promissory Note is now due in full, Boland, Ho, and Okebie, as personal guarantors, are now jointly and severally liable to Kale for all sums due under the Promissory Note, including principal, interest, penalties, and any other amounts.

72.     REPL, Boland, Ho, and Okebie owe Kale an amount in excess of $250,000.00 as it relates to the Loan, Promissory Note, and Unconditional Guaranties.

IV.     <u>Employment as Vice President of Strategic Accounts</u>

73.     On or around February 9, 2022, REPL hired Kale as its Vice President of Strategic Accounts.

74.     REPL paid Kale a salary of $70,000.00.

75.     As additional compensation, REPL (through Okebie) offered Kale a commission structure to induce Kale to join REPL.

76.     Kale agreed to take the VP position with REPL based in part on the commission structure represented to him.

77.     This verbal agreement regarding commissions required REPL to pay Kale 50% of the profit from any new business that Kale brought into REPL.

78.     Throughout his tenure as VP of Strategic Accounts, Kale continually asked to be paid his commissions.

79.     REPL refused each and every time.

80.     REPL terminated without cause Kale on August 31, 2023, with one days' notice.

81.     Despite terminating Kale, Okebie requested Kale's assistance in December 2023 to prepare for meetings with REPL's largest customer.

82.     Kale agreed and assisted Okebie and REPL as requested.

83.     Upon information and belief, the commissions owed to Kale per his employment agreement is approximately $150,000.00.

V.     <u>REPL's Undue Pressure Upon Kale to Extend Unfavorable Restrictive Covenants</u>

84.     Kale entered a Non-Compete and Non-Solicitation Agreement with REPL on February 9, 2021.

85.     In essence, the Non-Compete Agreement restricted Kale from working for a competitor, soliciting REPL's clients, and recruiting REPL's employees.

86.     Under the Non-Compete Agreement, Kale agreed that he would be bound by these restrictive covenants for a duration of *three years from the Closing Date* (February 9, 2021).

87.     In May 2024, REPL attempted to "amend" the Non-Compete and Non-Solicitation Agreement. A true and correct copy of the Proposed Amended Non-Compete Agreement is incorporated herein by reference and attached hereto **Exhibit 9**.

88.     In relevant parts, the Proposed Amended Non-Compete Agreement states the following:

a.     This Amendment . . . is entered into by: A. REPL Brokerage Holdings, LLC, on behalf of itself *and its predecessors, successors, divisions, subsidiaries, affiliates and parents, (including, but not limited to HTL Freight Holdings, Inc. and its affiliates and subsidiaries) and collectively, its employees, officers, directors, partners, agents, assignees, attorneys (past and present), and all other persons and entities acting, directly or indirectly, on behalf of or in concert with it (collectively "REPL")*.; and B. Dan E. Kale, Jr., on behalf of himself *and his successors, agents, assignees,*

*heirs, employees, independent contractors, and all other persons and entities acting, directly or indirectly on behalf of, in concert with, or for the benefit of him including, executors, beneficiaries, trustees, administrators, predecessors and legal representatives (collectively "Kale")*. (Emphasis added to show that REPL attempted to use this Proposed Amendment to expand the scope of the restrictive covenants to additional parties who were not parties to the initial Non-Compete Agreement)

b.     1. Modification of Sections 2(a) and 2(b). REPL and Kale agree that, *with respect to Kale only*, Sections 2(a) and 2(b) of the Agreement are hereby superseded and replaced with the following (Emphasis added to show the confusion among the language cited as it relates to Kale, *i.e.* in the immediately preceding subparagraph, "Kale" is defined as long list of potential individuals and this paragraph states its applies to "Kale only"):

c.     Prior to August 31, 2026, Kale shall not, directly or indirectly, on behalf of himself or any other person or entity:

d.     Contact or solicit any customer of *HTL Freight Holdings, Inc. ("HTL"), or any HTL subsidiary*, regarding or relating to any product or service that competes with a product or service of HTL; Accept any business or services of any HTL customer, and/or any HTL subsidiary customer, that is competitive with any product or service of HTL and/or an HTL subsidiary; Induce or attempt to induce any customer to terminate or reduce his/her/its relationship with HTL and/or any HTL subsidiary. (Emphasis added as, again, there is confusion about who is the actual party to this Proposed Amendment REPL or HTLF. And is HTLF a predecessor, successor, division, subsidiary, affiliate or parent of/to REPL? Moreover, there is no identification of who HTLF's "subsidiaries" are.)

e.     2. Affirmation of Sections 3 and 4. Kale acknowledges and affirms that the "Non-Competition Period" identified in Sections 3 and 4 of *the Agreement expires on August 31, 2026*, and that the restrictions stated in Sections 3 and 4 of the Agreement remain in full force and affect, and apply to HTL and/or any HTL subsidiary. (Emphasis added to note the extended timeframe for the restrictive covenants for an additional two-and-one-half years)

f.     3. No other changes to the Agreement. Kale acknowledges and affirms that, other than the changes contained in this Amendment regarding Sections 2(a) and 2(b) of the Agreement, *no other changes are being made to the Agreement and all remaining terms of the Agreement remain in full force and affect*. (Emphasis added to show that no additional consideration was offered to Kale to enter into this Proposed Agreement)

g. 4. Payment of Note and Insurance. So long as Kale remains in compliance with the terms of Section 1 of the Amendment and the terms of the Agreement that are still in full force and effect, *REPL will continue to comply with the duties and obligations it still owes Kale under the terms of the February 9, 2021 Purchase Agreement* entered into by and between REPL, Heritage Trucking, LLC, Sabre Express, Inc., Kale and Dan E. Kale, Sr., *including the payment of the Promissory Note* identified in Section 3(a)(ii) of the Purchase Agreement on February 9, 2026. *REPL also agrees to continue providing insurance benefits to Kale through December 31, 2024 so long as Kale remains in compliance with the terms of Section 1 of the Amendment* and the terms of the Agreement that are still in full force and effect. (Emphasis added to note that REPL was not offering additional consideration to Kale, but rather was attempting to reformulate its preexisting contractual duties)

89. REPL wanted the Proposed Amendment executed because the period restricting Kale's business activities had expired.

90. REPL wanted Kale to extend this period for an additional two-plus years.

91. However, instead of offering new consideration to Kale, REPL chose to rebrand its preexisting contractual duties as "new" consideration.

92. When REPL offered to "continue to comply with the duties and obligations it still owes Kale under the terms of the February 9, 2021 Purchase Agreement," it was obligated, pursuant to the Purchase Agreement and the Promissory Note, to "continue to comply" with those agreements.

93. The Proposed Amendment served no purpose other than to unlawfully intimidate, unduly pressure, leverage, and coerce Kale into extending his expired restrictive covenants.

94. Essentially, REPL threatened Kale that if he did not sign this one-sided Proposed Amendment, REPL would not fulfill its obligations under the Purchase Agreement and the Promissory Note.

95.     Even worse, and as discussed in greater detail above, the Purchase Agreement required REPL to provide health insurance to the Kale family, but BCBS terminated the Kales' health insurance coverage due to REPL's actions.

96.     Knowing how important health insurance was to the Kale family, REPL held the Kale family hostage demanding that Kale execute the Proposed Amendment or else REPL would not supply the requisite health insurance.

97.     Similarly, REPL held Kale himself hostage by disavowing its obligation to repay the $250,000.00 Loan to Kale unless and until he executed the Proposed Amendment.

VI.     <u>REPL's Unfounded Allegations of 2KC's Breach of the Consulting Agreement</u>

98.     On February 27, 2024, REPL sent a Violation of Consulting Agreement ("Violation Letter") addressed to Kale individually alleging various breaches of the Consulting Agreement. A true and correct copy of the Violation Letter is incorporated herein by reference and attached hereto **Exhibit 10**.

99.     The Consulting Agreement was with 2KC, not Kale.

100.    The Violation Letter recounted the terms of the Consulting Agreement as it related to confidential information, non-competition, and non-solicitation.

101.    In it, REPL admitted that Consulting Agreement terminated on August 31, 2023.

102.    REPL incorrectly alleged that Kale was "working for [HTLF] competitor Eastview Trucking LLC."

103.    Kale loaned Eastview Trucking $12,000.00, which has since been repaid.

104.    Kale also referred a customer to Eastview Trucking LLC, which amounted to approximately $8,450.00 in revenue for Eastview Trucking LLC.

105.    But Kale was not and has never worked for Eastview Trucking LLC.

106. Kale has not ever held any ownership interest in Eastview Trucking LLC.

107. Therefore, Kale nor 2KC were soliciting or competing as prohibited in the Consulting Agreement.

108. REPL's sole purpose was to intimidate Kale into capitulation.

109. Essentially, REPL was trying to enforce the Consulting Agreement against Kale, while REPL simultaneously refused to perform their obligations under the Consulting Agreement.

## <u>COUNT ONE</u>
(Violation of 29 U.S.C. 1161 *et seq.* against REPL, HTLF, and ABC Corporation)

110. All preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

111. 29 U.S.C. 1161 requires that a "qualified beneficiary" be notified of a qualifying event which will result in loss of insurance coverage under a "group health plan" that the qualified beneficiary may elect to continue coverage under the group health plan.

112. Kale, along with his spouse and three dependents are qualified beneficiaries per 29 U.S.C. 1167.

113. REPL and HTLF are employers per 29 U.S.C. 1167 and are not exempt under 29 U.S.C. 1161.

114. REPL and/or HTLF provided a group health plan to the Kale family.

115. A qualifying event, pursuant to per 29 U.S.C. 1163, occurred either when: 1) REPL and/or HTLF terminated Courtney Kale's employment; or 2) when REPL and/or HTLF failed to pay premiums in accordance with the group health plan.

116. REPL and/or HTLF failed to provide proper notice of the qualifying event to Plaintiffs or anyone in the Kale family.

117.    REPL and/or HTLF failed to provide proper notice of the qualifying event to its Plan Administrator.

118.    REPL and/or HTLF failed to provide proper notice of Plaintiffs' or anyone in the Kale family's right to elect continuation coverage under COBRA.

119.    The Plan Administrator failed to provide proper notice of Plaintiffs' or anyone in the Kale family's right to elect continuation coverage under COBRA.

120.    As a direct and proximate result of REPL and/or HTLF's failures, Kale has incurred medical expenses that would have been covered by the group health plan had the coverage not terminated.

121.    Similarly, as a direct and proximate result of the Plan Administrator's failures, Kale has incurred medical expenses that would have been covered by the group health plan had the coverage not terminated.

122.    Kale has been injured in an amount not less than $10,000.00 due to these COBRA violations.

123.    Moreover, REPL and/or HTLF and/or the Plan Administrator are liable to Kale for civil penalties as allowed by federal law, including but not limited to 29 U.S.C. 1132 *et seq.*

## COUNT TWO
*In the Alternative to Count One*
(Violation of N.C.G.S. 58-53-1 *et seq.* against REPL, HTLF, and ABC Corporation)

124.    All preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

125.    REPL and/or HTLF provided "Insurance" to the Kale family consistent with N.C.G.S. 58-53-1 *et seq.*

15

126.     Kale, along with his spouse and three dependents are members and/or employees per N.C.G.S. 58-53-1.

127.     Pursuant to N.C.G.S. 58-68-30(e):

A group health insurer shall provide the certification described in sub-subdivision b. of this subdivision: (i) at the time an individual ceases to be covered under the plan or otherwise becomes covered under a COBRA continuation provision, (ii) in the case of an individual becoming covered under a COBRA continuation provision, at the time the individual ceases to be covered under the COBRA continuation provision, and (iii) on the request on behalf of an individual made not later than 24 months after the date of cessation of the coverage described in clause (i) or (ii) of this sub-subdivision, whichever is later. The certification under clause (i) of this sub-subdivision may be provided, to the extent practicable, at a time consistent with notices required under any applicable COBRA continuation provision.

128.     N.C.G.S. 58-53-40 requires that "[a] notification of the continuation privilege shall be included in each individual certification of coverage."

129.     REPL and/or HTLF failed to provide proper certification of coverage to Plaintiffs or anyone in the Kale family.

130.     REPL and/or HTLF failed to provide proper notice to its Plan Administrator.

131.     REPL and/or HTLF failed to provide proper notice of Plaintiffs' or anyone in the Kale family's right to elect continuation coverage under N.C.G.S. 58-53-1 *et seq.*

132.     The Plan Administrator failed to provide proper notice of Plaintiffs' or anyone in the Kale family's right to elect continuation coverage under N.C.G.S. 58-53-1 *et seq.*

133.     As a direct and proximate result of REPL and/or HTLF's failures, Kale has incurred medical expenses that would have been covered by the group health plan had the coverage not terminated.

134.    Similarly, as a direct and proximate result of the Plan Administrator's failures, Kale has incurred medical expenses that would have been covered by the group health plan had the coverage not terminated.

135.    Kale has been injured in an amount not less than $10,000.00 due to these N.C.G.S. 58-53-1 *et seq.* violations.

136.    Moreover, REPL and/or HTLF and/or the Plan Administrator are liable to Kale for civil penalties as allowed by state law.

**COUNT THREE**
(Breach of Contract against REPL and HTLF)

137.    All preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

138.    Plaintiffs entered into several valid and enforceable contracts with REPL and/or HTLF, including but not limited to the Purchase Agreement, the Consulting Agreement, the Promissory Note. Additionally, Courtney Kale was a third party beneficiary to the Purchase Agreement.

139.    REPL and/or HTLF breached the Purchase Agreement by failing to provide the required insurance for the Kale family (i.e., the third party beneficiaries).

140.    REPL and/or HTLF breached the Consulting Agreement by failing to make the required fee and commission payments to 2KC.

141.    REPL and/or HTLF has anticipatorily breached the Promissory Note by unequivocally and directly notifying Plaintiffs that REPL and/or HTLF do not intend to fulfill their obligations thereunder.

142.    All of REPL and/or HTLF's breaches are material.

143.     Plaintiffs have fulfilled all their obligations under the Purchase Agreement, the Consulting Agreement, and the Promissory Note.

144.     Due to REPL and/or HTLF's breaches, Plaintiffs have been proximately damaged in an amount exceeding $75,000.00.

## COUNT FOUR
(Breach of Contract against Boland, Ho and Okebie)

145.     All preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

146.     Kale loaned REPL and/or HTLF $250,000.00 per the Purchase Agreement.

147.     In return, REPL and/or HTLF executed and delivered a Promissory Note to Kale.

148.     To secure the Promissory Note, Boland, Ho, and Okebie executed personal, unconditional guaranties.

149.     As part of these Unconditional Guaranties, Boland, Ho, and Okebie were personally and jointly and severally liable to Kale for amounts due under the Promissory Note.

150.     As REPL and/or HTLF has anticipatorily breached the Promissory Note, it is now due in full.

151.     Thus, Boland, Ho, and Okebie are liable to Kale for the entire Promissory Note amount.

152.     Boland, Ho, and Okebie have not paid the amounts due to Kale.

153.     Therefore, Boland, Ho, and Okebie have materially breached their contractual duty to Kale.

154.     Due to Boland, Ho, and Okebie's breaches, Kale have been proximately damaged in an amount exceeding $75,000.00.

## COUNT FIVE
(Violation of Unfair and Deceptive Trade Practices Act against REPL and HTLF)

155.    All preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

156.    REPL and/or HTLF are companies that are in and affect commerce.

157.    Despite its continued obligation to provide health insurance coverage to the Kale family, a necessity due to medical conditions afflicting its members, REPL and/or HTLF canceled said health insurance.

158.    REPL and/or HTLF "offered" to reinstate the Kale family's medical coverage only if Kale agreed to extend his restrictive covenants for an additional three years in accordance with the Proposed Amended Non-Compete.

159.    Despite its continued obligation to pay Kale in accordance with the Promissory Note, REPL and/or HTLF unequivocally stated that it was not going to fulfill this contractual duty.

160.    Likewise, REPL and/or HTLF "offered" to continue paying back its Loan from Kale, but only if Kale agreed to extend his restrictive covenants for an additional three years in accordance with the Proposed Amended Non-Compete.

161.    At the time it made its "offer," REPL and/or HTLF knew that it already had a pre-existing duty.

162.    As such, REPL and/or HTLF engaged in unfair and deceptive trade practices by employing these tactics as a means to intimidate, harass, upset, coerce, and unduly pressure Kale into submit to REPL and/or HTLF's arbitrary, unreasonable, and unlawful demands.

163.    As a result of REPL and/or HTLF's unfair and deceptive trade practices, Kale has been injured in an amount that exceeds $75,000.00.

(Fraud against REPL and HTLF)

164.    All preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

165.    REPL and/or HTLF offered Kale employment as its Vice President of Strategic Accounts.

166.    To induce Kale to accept this position, REPL and/or HTLF agreed to pay Kale commission equal to 50% of the profit from any new business that Kale brought into REPL.

167.    Based upon this representation, Kale accepted REPL and/or HTLF's employment offer.

168.    Throughout his tenure as VP of Strategic Accounts, Kale continually asked to be paid his commissions.

169.    REPL and/or HTLF refused each and every time.

170.    REPL and/or HTLF's representations regarding its intent to pay Kale commissions were false and fraudulent.

171.    REPL and/or HTLF's representations regarding its intent to pay Kale commissions were material as the formed part of Kale's informed decision making on whether or not to accept the employment offer.

172.    REPL and/or HTLF never intended to pay Kale any commissions.

173.    REPL and/or HTLF's representations were made and intended to induce Kale to accept the employment offer.

174.    Kale justifiably relied upon REPL and/or HTLF's representations when accepting the employment offer.

175.    Due to REPL and/or HTLF's false and fraudulent representations, Kale has been injured in an amount that exceeds $75,000.00.

## COUNT SEVEN
(Declaratory Judgment REPL and HTLF)

176.    All preceding paragraphs are re-alleged and incorporated by reference as if fully set forth herein.

177.    REPL and/or HTLF and 2KC entered the Consulting Agreement.

178.    REPL and/or HTLF and Kale entered the Non-Competition Agreement.

179.    Both of these agreements contained provisions which prohibit 2KC and Kale from engaging in business activities which "compete" with REPL and/or HTLF.

180.    The provisions of these two agreements which purport to prohibit 2KC and Kale from engaging in business activities which "compete" with REPL and/or HTLF are unenforceable pursuant to 16 CFR 910, which prohibits non-compete clauses as an unfair method of competition.

181.    As such, REPL and/or HTLF and 2KC and Kale are interested parties to contracts that may be affected by statute.

182.    An actual controversy between 2KC and Kale, on the first hand, and REPL and/or HTLF, on the second hand, exists as to the enforceability of the non-compete clauses.

183.    A declaratory judgment will serve a useful purpose in clarifying and settling the legal relation at issue.

184.    Moreover, a Declaratory judgment will terminate and afford relief from uncertainty, insecurity, and controversy as it relates to the enforceability of the non-compete clauses.

**WHEREFORE**, Plaintiffs pray this court grant them the following relief:

1.    Compensatory damages in excess of $75,000.00;

2.      Punitive damages, as allowed by North Carolina law;

3.      Treble damages, as allowed by North Carolina law;

4.      Attorney fees and legal costs and/or expenses, as allowed by North Carolina law;

5.      Attorney fees and legal costs and/or expenses, as allowed by federal law;

6.      Civil penalties as allowed by state law;

7.      Civil penalties as allowed by federal law;

8.      Defendants be taxed with the costs of this action;

9.      Defendants be held jointly and severally liable;

10.     Any other relief that this court deems just and proper.


This 19th day of August 2024.


                                        /s/Laura Budd
                                        Laura Budd, NC Bar # 28823
                                        *lbudd@baucomclaytor.com*
                                        Jonathan Salmons, NC Bar # 57201
                                        *jsalmons@baucomclaytor.com*
                                        Baucom Claytor Benton Morgan Woods PA
                                        200 Providence Road, Suite 106
                                        Charlotte, NC 28207
                                        704-376-6527 (phone)
                                        704-376-6207 (fax)

## **VERIFICATION**

Plaintiff, Dan E. Kale, Jr., being duly sworn, deposes, and says that he is the Plaintiff herein; that he has read the foregoing document and knows the contents thereof, and that the same is true of his own knowledge, except as the matters therein stated upon information and belief, and as to those he believes to be true.

_____
Dan E. Kale, Jr.

STATE OF NORTH CAROLINA
COUNTY OF MECKLENBURG

(SEAL)

Sworn and Subscribed to me
this day 13 of June 2024.

_____
Notary Public

My Commission Expires: 6-13-26

SHARON SIMPSON
NOTARY
PUBLIC
CABARRUS COUNTY, NC